IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 17, 2021, at Knoxville

**STATE OF TENNESSEE v. JASON MATTHEW CAMPBELL**

**Appeal from the Criminal Court for Putnam County**
**No. 2016-CR-739    David A. Patterson, Judge[1]**

_____

**No. M2020-01045-CCA-R3-CD**

_____

The Defendant, Jason Matthew Campbell, appeals his convictions and effective twenty-three-year sentence for possession of more than 0.5 grams of methamphetamine with the intent to sell or deliver, possession of a firearm by a convicted violent felon, and possession of a firearm during the commission of a dangerous felony.  The Defendant argues that the evidence was insufficient to establish his constructive possession of the methamphetamine and pistol and that the prosecutor committed misconduct during rebuttal argument by violating the missing witness rule, shifting the burden of proof, and stating a personal opinion.   After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JILL BARTEE AYERS, JJ., joined.

Craig P. Fickling, District Public Defender, and Benjamin D. Marsee, Assistant Public Defender, for the appellant, Jason Matthew Campbell.

Herbert H. Slatery III, Attorney General and Reporter; Jin I. Yoo, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Mark E. Gore and Bret T. Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

The Defendant's convictions arise from a July 26, 2016 traffic stop of a car in which the Defendant was a passenger.  The January 2017 term of the Putnam County Grand Jury

---

[1] Judge Patterson retired in 2019 after the Defendant's sentencing; Judge Wesley T. Bray presided over the Defendant's motion for new trial.

charged the Defendant with possession of twenty-six grams or more of methamphetamine with the intent to sell or deliver, a Class B felony (Count 1); simple possession of a Schedule IV controlled substance, a Class A misdemeanor (Count 2); simple possession of a Schedule III controlled substance, a Class A misdemeanor (Count 3); possession of unlawful drug paraphernalia, a Class A misdemeanor (Count 4); possession of a firearm by a felon convicted of an offense involving the use or attempted use of force, violence, or a deadly weapon, a Class C felony (Count 5); and possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony (Count 6). See Tenn. Code Ann. §§ 39-17-417(a)(4), -17-417(i)(10), -17-418(a), -17-425(a)(1), -17-434, -17-1307(b)(1)(A), -17-1324(g)(1).

On December 4, 2017, the Putnam County Grand Jury issued a superseding indictment, which amended Count 1 to reflect that the Defendant possessed more than 0.5 grams of methamphetamine, and amended Count 6 to reflect that the Defendant was previously convicted of a felony. See Tenn. Code Ann. §§ 39-17-417(c)(1), -17-1324(g)(2).[2] On September 4, 2018, the State filed a notice of intent to dismiss Counts 2 and 3 if the case proceeded to trial. A second superseding indictment removed Counts 2, 3, and 4, and renumbered the remaining three counts for trial to reflect the following: Count 1, possession of more than 0.5 grams of methamphetamine with the intent to sell or deliver, Count 2, possession of a firearm by a convicted violent felon, and Count 3, possession of a firearm with the intent to go armed during the commission of a dangerous felony.

At trial, Cookeville Police Department (CPD) Patrol Officer Colby Fox testified that on July 27, 2016, at 1:17 a.m., he pulled over a car because the light above the license plate was not illuminated. The car's driver initially identified herself as Christina Hardie; however, Officer Fox later learned that the driver was Jennifer Swanson and that the real Christina Hardie, who owned the car, was sitting in the back driver's side seat. The Defendant was in the front passenger seat. Ms. Swanson told Officer Fox that she did not have her identification or the car's registration. Officer Fox eventually discovered that an arrest warrant had been issued in Cumberland County for Ms. Swanson. When Officer Fox told the Defendant to place his hands on the car's ceiling, Ms. Swanson and the Defendant told Officer Fox that he was unable to comply due to a physical disability. Officer Fox asked the Defendant for his identification, and the Defendant claimed that his wallet had been stolen. Ms. Hardie provided her identification upon request.

Officer Fox testified that backup officers arrived and that he placed Ms. Swanson under arrest. Ms. Swanson denied possessing any contraband, but CPD Officer Elizabeth

---

[2] These amendments did not affect the felony class, but instead decreased the potential fine from $200,000 to $100,000 in Count 1 and enhanced the mandatory minimum sentence from three years to five years in Count 6.

Fernandez[3] performed a pat-down incident to her arrest and discovered a used syringe in Ms. Swanson's brassiere. Ms. Hardie was also searched and had no contraband. When Officer Fox asked the Defendant to step out of the car, the Defendant responded again that he was unable to do such because of his physical disability. The Defendant stated that his walker was in the car's back seat. Officer Fox stated that the Defendant had a couple of knives in his possession, including one with a handle designed to resemble a gun that the Defendant wore in a holster on his belt. The Defendant denied several times that he had any drugs in his possession.

Officer Fox testified that Ms. Swanson, who had been placed in the back of his police cruiser, asked him to search her backpack in the car and retrieve her bank card. When Officer Fox searched the backpack, he found another syringe, two sets of digital scales, and a small container used to melt methamphetamine. Officer Fox also stated that he found unused baggies in the backpack but that he did not make written note of them.

Officer Fox returned to Ms. Hardie's car and noticed a metal box with a "zebra print" at the Defendant's feet. Officer Fox asked Officer Fernandez to remove the box; when she reached into the passenger compartment, the Defendant said several times that it was his and asked them not to search it. Officer Fox noted that the Defendant "was not happy" that Officer Fernandez took the box. The Defendant claimed that the box contained his toothbrush and toothpaste. Officer Fox called for a K-9 unit so that he could search for drugs without the Defendant's having to exit the car.

Officer Fox testified that Putnam County Sheriff's Deputy Caleb Meadows responded with a K-9 unit. The dog sniff-searched around the car and signaled several times toward the zebra-print box. Officer Fox opened the box and found a couple of bags containing pills, two marijuana "roaches," a pipe, unused plastic baggies, and scales. The box also contained a gift card, batteries, a cell phone charger, a plastic spoon, a green plastic container, a plastic bag tied closed with a knot, a pocket knife, a "lid of some sort . . [with] a crystal substance inside," a black bag, a marker, a lighter, a set of headphones, a razor blade, knife blades, electrical tape, coupons, and a metal spoon. Officer Fox placed the Defendant under arrest, and the Defendant denied that the box was his and refused to exit the car using his walker. The officers eventually had to lift him into the back of a police cruiser.

After the Defendant's removal from the car, Officer Fox found a 9mm Taurus pistol tucked under the front passenger seat; Officer Fox noted that the pistol's handle was plainly visible protruding from underneath the seat and that the extended magazine contained

---

[3] The trial transcript refers to Officer Elizabeth Hernandez, but the pretrial motions use the surname Fernandez. We will use the surname contained in the motions.

twenty-four bullets, including one bullet in the firing chamber. The officers also found a black bag tied around the clasp of the front passenger-seat seatbelt, which Officer Fox estimated may have been touching the Defendant's leg as he sat. Inside the bag, the officers discovered bags of methamphetamine. Additionally, a bag of men's clothing in the back seat contained an additional magazine for the pistol, multiple sets of scales, a green plastic pill container with two types of pills inside, a prescription bottle, and more unused baggies. When the Defendant was searched, officers found a small bag of a leafy green substance and $1,352 in cash on his person.

Officer Fox's police cruiser and body camera recordings were introduced as an exhibit and played for the jury; Officer Fox noted that his body camera malfunctioned during the traffic stop. The recording reflected that the bottom third of the screen was pixelated and blurry, and streaks flickered across the upper two-thirds of the screen, making the images periodically hard to see. The police cruiser recording captured some of the same audio as the body camera and showed a wider perspective of Ms. Hardie's car and Officer Fox's searching Ms. Swanson's backpack.

The recordings showed Officer Fox's initial conversation with Ms. Swanson in which she pretended to be Ms. Hardie, the Defendant's explaining that he was disabled and his wallet had been stolen, and Officer Fox's questioning the Defendant about his knives and a possible gun he wore on his belt. After Officer Fernandez arrived, Officer Fernandez explained to Officer Fox that the car's driver admitted that she was Ms. Swanson. Officer Fernandez conveyed Ms. Swanson's belief that she had a suspended driver's license.

In the recording, Ms. Swanson and Ms. Hardie both told the officers that they did not know the Defendant well and that he was a friend of the other woman. Ms. Swanson further stated that she was on probation because she "took a drug charge" for a man and that she had completed drug court, although she also admitted to using methamphetamine the previous day. Ms. Swanson denied that she had any contraband on her person and apologized repeatedly to Officer Fernandez about not disclosing the syringe in her bra. Ms. Swanson further denied that any contraband was inside the car. After Officer Fox placed Ms. Swanson in the back seat of his police cruiser, Ms. Swanson repeatedly yelled about being too hot, her handcuffs hurting, and wanting her bank card. Ms. Swanson also tried to converse with Ms. Hardie, alternately asking her for her help and cursing at her; at one point, Ms. Swanson accused Ms. Hardie of placing a syringe in Ms. Swanson's backpack.

Meanwhile, the recording showed Officer Fox's finding a round container inside Ms. Swanson's backpack, which contained a smaller orange round plastic dish. Officer Fox showed the small dish to the other officers, and they agreed that a residue in the dish looked like methamphetamine. Officer Fox asked Ms. Hardie if the zebra-print box was hers, and she responded negatively. Ms. Hardie asserted that her car had been stolen by a

friend, that the friend had just returned it, and that Ms. Hardie had not yet searched the car for anything the friend left behind.

In the recordings, Officer Fox addressed the Defendant and asked if he had any drugs or if anything was in the car. The Defendant denied having drugs multiple times and stated that he doubted anything was in the car; he noted that he needed to get a ride to the place he was staying to access his medication and wheelchair. The Defendant protested that he was not doing anything wrong and stated that the only drug he used was marijuana. When Officer Fernandez reached in to get the zebra-print box, the Defendant said repeatedly that the box was his and that the box did not contain drugs.

The recordings showed the dog's jumping and whining at the zebra-print box, which had been placed on the back of the car. Officer Fox opened the box and removed an "Altoid" container, which contained a "large amount" of pills and a glass pipe. Officer Fox returned to his police cruiser and identified some of the pills as gabapentin. He noted to another officer that the Defendant had "bags of stuff, and a buttload of these," referring to the gabapentin.

In the recordings, Officer Fox returned to the Defendant and stated that he was under arrest because of the pills. The Defendant asked to what Officer Fox was referring and stated that the box he claimed as his was black with skulls and a zipper around the side. Officer Fox responded that the Defendant had clearly identified the zebra-print box as his. The Defendant repeatedly stated that he did not have or use any drugs and that he only smoked marijuana. When confronted with the two marijuana roaches from the zebra-print box, the Defendant said, "Wish I would've known that." The Defendant asserted that his rights were being violated. The police cruiser recording showed officers' lifting the Defendant out of Ms. Hardie's car and into an adjacent police cruiser. Officer Fox's body camera recording ended before the Defendant was removed from the car. The police cruiser recording continued and showed the officers' searching Ms. Hardie's car, but due to the distance between the cars, the pistol and methamphetamine were not clearly visible.

On cross-examination, Officer Fox acknowledged that he had been an independent patrol officer for about nine months at the time of the traffic stop and that he had been a trainee officer for about nine months previous to that time. He estimated that he had made hundreds of traffic stops before he stopped Ms. Swanson. Officer Fox agreed that people routinely lied to him during traffic stops, that people sometimes had drugs in a car, and that it was not unusual for a person he stopped to be "a little bit difficult." He said that the events during the traffic stop in this case were not uncommon. Officer Fox stated that in the body camera recording, the Defendant used his fist and forearm to open and shut the glove compartment, which indicated that his hands worked differently. Officer Fox acknowledged that in the recording, he described the Defendant as looking like he had

cerebral palsy; he explained that a classmate in high school suffered from cerebral palsy and carried his hands similarly to the Defendant. Officer Fox stated that although he could have charged Ms. Swanson with criminal impersonation and possession of illegal drug paraphernalia, he chose not to do so.

Officer Fox stated that none of his written police reports were one hundred percent accurate, and he acknowledged that his report detailing the traffic stop incorrectly listed the Defendant as the car's owner. He admitted that he could have supplemented the report to correct the error, but he said that he did not see the mistake. Officer Fox stated that to his knowledge, the other officers on the scene did not write separate reports, although it was his experience that officers like Deputy Meadows had to write a report every time a K-9 was deployed. Officer Fox acknowledged that he did not include the names of every officer present in his report. Prior to trial, he had never viewed the recording from his police cruiser camera.

Officer Fox acknowledged that in the police cruiser recording, Ms. Swanson offered her cell phone to Ms. Hardie in exchange for Ms. Hardie's speaking to the officers and convincing them not to charge her in connection with the syringe. Ms. Swanson also accused Ms. Hardie of putting the second syringe in her backpack. When asked whether it was important for him to have known that Ms. Swanson accused Ms. Hardie, Officer Fox responded that it was not uncommon for a person to blame someone else when the person was arrested. He said that he assumed Ms. Swanson knew what was inside her backpack because she claimed it as hers.

Officer Fox acknowledged that a conversation occurred between another officer and Ms. Swanson and that the conversation was not documented anywhere other than the police cruiser recording. Officer Fox stated that he did not take photographs of a cell phone and other items that he found in the car or collect various items as part of the Defendant's personal effects, including the bag of men's clothing. He said that the police had been instructed not to send large amounts of personal belongings to the jail. Officer Fox admitted that the contents of the bag would have been relevant evidence, given that he used the clothing to conclude that the bag belonged to the Defendant. Similarly, although he acknowledged that loading a pistol potentially involved direct contact with a person's hands, Officer Fox never ordered fingerprint testing of the pistol.

Officer Fox testified that the tip of the pistol was protruding from underneath the Defendant's seat, although he did not remember which part of the pistol was visible. He acknowledged that he did not note any such details in his report. Officer Fox stated that he did not see the pistol until the Defendant was removed from the car. When defense counsel noted that Officer Fernandez did not see the pistol while she removed the zebra-print box from the passenger's-side floorboard, Officer Fox responded that the Defendant's

legs obscured her view of both the pistol and the black bag of methamphetamine.  Officer Fox said that the black bag was tied to the seatbelt latch and not merely looped around it.

CPD Lieutenant Chase Mathis, an expert in narcotics investigation, testified that he was the drug unit supervisor between 2009 and 2017 and that he was familiar with methamphetamine sales as a result of his work, which included undercover investigations.  After reviewing the Defendant's case file, Lieutenant Mathis stated that the amount of methamphetamine in the black bag was worth about $2,700 in 2016.  He said that it was typical to find a gun near large amounts of methamphetamine to protect the seller from robbers seeking drugs or cash.  He noted that drug buyers usually paid with cash, although occasionally a buyer would barter a valuable item like a car for a large amount of drugs.  Lieutenant Mathis opined that it would not have been unusual for a methamphetamine seller to have $1,300 on his person.

Lieutenant Mathis testified that drug buyers did not typically carry scales because they knew that if they were caught with drugs and a scale, the police could arrest them for possession with intent to sell.  Lieutenant Mathis noted that a person selling prescription pills did not need a scale because the dosage was standardized.  Conversely, drug sellers who sold loose drugs like methamphetamine would use scales to ensure they were not selling more than the amount for which the buyer paid.  He stated that packaging materials like unused baggies were commonly found with drug sellers, and he noted that sellers did not want to be caught with a large quantity of drugs pre-packaged in the small bags.

Lieutenant Mathis testified that a person using drugs would not have had baggies or the quantity of methamphetamine found in this case.  He noted that methamphetamine users injected it as a "last resort" to obtain a high when other methods no longer worked.  Lieutenant Mathis stated that people injecting methamphetamine did not generally carry a lot of cash because as soon as they obtained money, they would buy more methamphetamine.  Lieutenant Mathis said that it was possible for a person to buy a larger amount of methamphetamine following a financial windfall, although he repeated that a "hard core user" would not typically carry that much cash.  Lieutenant Mathis stated that sometimes, heavy methamphetamine users would become dealers to support their addictions.  Lieutenant Mathis said that the tarry residue on the glass pipe found in the zebra-print box was more consistent with marijuana or tobacco use than methamphetamine, which left a white vapor-like residue.

On cross-examination, Lieutenant Mathis agreed that a drug seller would need scales to sell marijuana.  Lieutenant Mathis explained that a drug seller might sell drugs on credit to a known party if the party promised to pay later, sometimes for an additional fee, and that this practice was known as "fronting."  He stated that this occurred between drug sellers and customers, as well as between a larger-scale seller and a smaller dealer.

Lieutenant Mathis testified that both women and men sold drugs and that a person with two or more sets of scales might be a drug seller. He identified the leafy substance collected from the Defendant as marijuana and agreed that the marijuana would have been portioned from a larger amount. He stated that he expected a drug seller to have cash on the seller's person. Lieutenant Mathis stated that to connect a gun to a person, he considered "constructive possession" and whether the gun was "within [the person's] span of control." He said that if a magazine were found inside a bag of clothing, he would want to examine the clothing, but would not necessarily collect the clothing as evidence.

Lieutenant Mathis testified that he had previously submitted report requests to the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) using a gun's serial number. He noted that because Tennessee had no law requiring documentation in private gun sales, an ATF report would typically only reflect where the gun was originally sold. Lieutenant Mathis stated that he was trained in collecting fingerprints and agreed that the outside of a gun's magazine was a surface onto which fingerprints might be deposited. He further agreed that it was possible to use recovered fingerprints to narrow a perpetrator's identity in cases in which multiple people were suspects and provided fingerprint samples at booking.

On redirect examination, Lieutenant Mathis testified that he would not have sent the pistol for fingerprint testing in this case. He stated that unless a person was arrested while possessing a gun, an ATF report would not indicate if a "criminal" had the gun. He noted that the Tennessee Bureau of Investigation (TBI) kept records of sales at gun shows or from a federal firearms licensee. He stated that guns were freely transferred among criminals in Tennessee. Relative to fingerprints, Lieutenant Mathis said that in his experience, one or two out of one hundred fingerprint submissions to the TBI yielded a match. He stated that the existence and quality of fingerprints depended upon variables such as the dryness of a person's hands, the environment, and the portion of fingerprint deposited. He could not conclude that a person did not touch a surface merely from the absence of fingerprints.

TBI Agent Rebecca Hernandez, an expert in forensic chemistry, testified that she tested the substances recovered from Ms. Hardie's car. One bag contained 27.53 grams of methamphetamine; she noted that she did not test a second bag, which contained 1.53 grams of a similar-looking substance. The small bag taken from the Defendant contained 1.71 grams of marijuana. The orange pills from the zebra-print box were gabapentin, a pain medication that was not a controlled substance in 2016. Additional pills from the box tested positive for buprenorphine, a Schedule III controlled substance; carisoprodol, a Schedule IV controlled substance; prochlorperazine, a non-controlled nausea medication; and hydroxyzine, a non-controlled antihistamine and anxiety medication. Agent Hernandez did not test the marijuana roaches.

At the close of the State's evidence, the parties stipulated that the Defendant was convicted of voluntary manslaughter on June 1, 1998, in Davidson County. The parties further stipulated that the conviction was for a violent felony. The Defendant's proof consisted of an affidavit from Putnam County Clerk Wayne Nabors, which stated that Ms. Hardie's car was registered to her.

Upon this evidence, the jury convicted the Defendant as charged. After a sentencing hearing, the trial court imposed an effective twenty-three-year sentence.

## ANALYSIS

On appeal, the Defendant contends that the evidence is insufficient to establish his possession of the methamphetamine and firearm and that the prosecutor improperly referred to missing witnesses, shifted the burden of proof to the Defendant, and discussed the prosecutor's personal opinion during rebuttal argument. The State responds that the evidence is sufficient and that the prosecutor's comments, which were made in response to defense counsel's closing argument, were not improper.

### I.      Sufficiency

The Defendant argues that there was insufficient evidence to support his convictions because the State failed to prove actual or constructive possession of the methamphetamine or the pistol. He does not contest the remaining elements of the respective offenses. The State responds that there was sufficient evidence to sustain the convictions. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely

upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, it is an offense to knowingly "[p]ossess methamphetamine with intent to . . . deliver or sell methamphetamine." Tenn. Code Ann. § 39-17-434(a)(4). If the amount of methamphetamine involved is 0.5 grams or more, the offense is a Class B felony. Tenn. Code Ann. § 39-17-434(e)(1), -417(c)(1).

Relative to this case, "[i]t is an offense to possess a firearm . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(a). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). "A felony involving. . . possession with intent to sell, manufacture or distribute a controlled substance" is a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(L).

Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon." There was no dispute that the Defendant had a prior conviction for voluntary manslaughter.

"Possession may be actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). "[A]ctual possession refers to physical control over an item," while "constructive possession requires only that a defendant have 'the power and intention to exercise dominion and control over' the item allegedly possessed." State v. Fayne, 451 S.W.3d 362, 370 (Tenn. 2014) (quoting Shaw, 37 S.W.3d at 903). Whether a defendant constructively possessed contraband "depends on the totality of the circumstances in each case," and constructive possession

"may be proven by circumstantial evidence." Robinson, 400 S.W.3d at 534 (citing Tenn. Code Ann. § 39-17-419).

In this case, the evidence is sufficient to establish that the Defendant actually or constructively possessed the methamphetamine and pistol. After arresting Ms. Swanson and finding drug paraphernalia, scales, and unused baggies on Ms. Swanson's person and inside her backpack, Officer Fox directed Officer Fernandez to remove the zebra-print box from the front passenger's-side floorboard near the Defendant's feet. The Defendant stated that the box belonged to him and denied that it contained drugs. After a K-9 reacted to the box, Officer Fox opened it and discovered a large quantity of prescription pills and unused baggies. Officer Fox arrested the Defendant, who then denied ownership of the box. When the officers lifted the Defendant out of the car, a pistol was protruding from underneath the seat, and a black bag containing a large amount of methamphetamine was tied around the seat belt buckle. The Defendant also had more than $1,300 in cash in his pocket. Officer Fox described the location of the bag and stated that the Defendant's leg probably touched the bag as he sat in the car. It is reasonable to infer that the Defendant could have exercised dominion and control over the black bag and the pistol. The large amount of cash on the Defendant's person also circumstantially established that he constructively or actually possessed the drugs and pistol. Given the totality of the circumstances, we conclude that the evidence was sufficient to sustain the Defendant's convictions. He is not entitled to relief on this basis.

## II.    Missing Witnesses

The Defendant contends that the State committed prosecutorial misconduct by discussing missing witnesses during rebuttal argument, specifically, Officer Fernandez, Ms. Swanson, and Ms. Hardie. In a related issue, the Defendant asserts that the prosecutor impermissibly shifted the burden of proof by saying that the Defendant could have called any of the missing witnesses himself; in support of this argument, the Defendant notes two questions the jury asked the trial court during deliberations. Finally, the Defendant submits that the prosecutor injected his personal opinion into his rebuttal argument by stating that the prosecutor did not call witnesses unless he was certain the witnesses would be truthful with the jury. The State responds that the missing witness rule was not implicated by the prosecutor's rebuttal, which was made in response to the Defendant's raising the missing witnesses in his closing argument. In the alternative, the State argues that any error in closing arguments was harmless.

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005).

As explained by our supreme court in Sexton, there are five general areas of potential prosecutorial misconduct related to closing argument:

(1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the

- 12 -

consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Sexton, 368 S.W.3d at 419 (citing Goltz, 111 S.W.3d at 6 (citations omitted)); see also American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 (1970).

In certain situations, if a party fails to call a particular witness, an inference may be drawn that had the witness testified, the testimony would have been unfavorable to that party. See State v. Bough 152 S.W.3d 453, 463 (Tenn. 2004), modified on other grounds by State v. Hatcher, 310 S.W.3d 788 (Tenn. 2010); see also State v. Francis, 669 S.W.2d 85, 88 (Tenn. 1984). Before a party is permitted to invoke the missing witness rule,

the evidence must show that [1] the witness had knowledge or material facts, [2] that a relationship exists between the witness and the party that would naturally incline the witness to favor the party; and [3] that the missing witness was available to process of the [c]ourt for trial." []Francis, 669 S.W.2d at 88 (quoting Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979)). "[W]hen it can be said 'with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony,' an inference may be drawn by the jury that the testimony would have been unfavorable." Id. at 88-89 (quoting Burgess v. United States, 440 F.2d 226, 237 (D.C. Cir. 1970)); see also 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.16. However, the inference is not appropriate when the proof fails to establish all three of the Delk factors. See Francis, 669 S.W.2d at 88 n.3. Due to the "potentially critical effect of the missing witness rule," the Delk requirements must be strictly construed. Id. at 89.

State v. Whitaker, No. E2014-02330-CCA-R3-CD, 2015 WL 5179196, at *2 (Tenn. Crim. App. Sept. 4, 2015). Furthermore, "[t]he inference may not be invoked when it is merely shown that (1) the witness 'may have some knowledge of the facts involved,' Francis, 669 S.W.2d at 88, or (2) the witness is equally available to both parties. State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992)." State v. Walter Williams, No. W2009-02438-CCA-R3-CD, 2011 WL 2306246, at *6 (Tenn. Crim. App. June 7, 2011).

In this case, the Defendant was the first party to raise the issue of missing witnesses in closing:

So the first major category of things that we didn't hear, that we didn't see, I would characterize it as missing witnesses . . . . Who are they? We've got some police officers, right, who are not here, we didn't hear from them. We've got Elizabeth [F]ernandez. We've got Jamar Minter, right, he's the officer that we see on the video, don't really hear him talking, but he's that male officer who's there early. You can see him on the body camera. You know we've got him.

We've got Caleb Meadows. You remember that's the Putnam County Sheriff's Deputy who shows up with the dog. Right? He's not been here. There's a fourth officer who is on the scene. I think his name is Sergeant Weicher. I personally have never met him, I take Officer Fox at his word that's who it is. Again, not heard from him. Right?

And of course critically we have not heard from the two people who probably should be sitting at that table with [the Defendant], Christina Hardie and Jennifer Swanson. Right?

Now [the State] has made a very good point during his closing argument here, which is the fact that they didn't come and testify, well does that really matter . . . that their witnesses were missing. The fact that they're absent does not matter. What matters is what they could have said if they had been here and whether what they could have said if they had been here can get you to the point of beyond a reasonable doubt. Or whether instead the things that they did not say, because they were not here to say them, may be generating a reasonable doubt.

What am I talking about?

I think the best example from this list I can give you is Officer [F]ernandez. Remember when I'm talking with Officer Fox and he's on the stand and we're talking about the gun and where the gun is, if he's seen the gun when [the Defendant] is in the car? Who pulled the box from [the Defendant's] feet, who did that? Was it Officer Fox? No, it wasn't him . . . . It was Elizabeth [F]ernandez.

Defense counsel stated that in order to find the Defendant guilty of the firearm-related charges, the jury had to find that the Defendant knew the pistol was underneath his seat. Counsel said,

There are . . . three ways the [S]tate suggests to you that you can get

- 14 -

there, to [the Defendant's] knowing the gun is there. One of those ways is that, according to Officer Fox, some portion of the gun, some portion of it is visible, at least from the seat. What portion? Do we know?

. . . .

If [the extended magazine was protruding], can he even tell it's a gun until he pulled it out? Do we know any of that? No. Who could have told us? [F]ernandez. Where is she? She's not here. What would she say? We don't know. Does she even remember?

We talked about reports, the report didn't come into evidence, it's not evidence for you to consider . . . . We've not seen any video from Officer [F]ernandez . . . . We have no way of knowing what testimony would have been. We don't even know if she could tell us today what she saw when she pulled the box out. Is that important? . . . . Is that, the fact that a portion of the gun was sticking out from under the seat, is that a fact that [the State] relies on to get you beyond a reasonable doubt? Yes, it is. That's why it matters that she's missing today . . . . Because she could clarify that for him. She maybe, maybe she can get you beyond a reasonable doubt. She's not here, you don't have that, they ain't give [sic] it to you.

. . . .

There's the whole interview with Ms. Swanson. Right? You all heard it for the first time and the same time that [Officer] Fox did. So maybe that would be helpful to know what he talked with her about. But again, I'm not, I'm not here to say that they are as critically important for purposes of proving what the [S]tate is trying to prove.

What about Hardie and Swanson? It might be nice to hear from them, right? It might be nice to hear them say they didn't know these things existed. But you've just heard [the State] tell you that they could have been charged, maybe they should have been charged along with [the Defendant]. And we've all talked about people who have been charged not having to take the witness stand. They're missing. Interviews with them, more information from them would probably help.

This is the big problem. Where's [F]ernandez? Where is she? Is there any reason she's not here? No.

- 15 -

The remainder of the Defendant's closing related to "missed leads" such as Ms. Swanson's accusing Ms. Hardie of planting the syringe in her backpack, Ms. Swanson's having multiple sets of scales in her possession and her proximity to the methamphetamine as the car's driver, and the methamphetamine's being separated from the drugs in the zebra-print box. Defense counsel also discussed the police's failure to request an ATF trace of the pistol, attempt to obtain fingerprints from the pistol, and collect the bag of clothing as evidence.

The State's rebuttal reiterated that its burden was to prove the elements of the offense beyond a reasonable doubt, not to answer "every question" the jury might have. The prosecutor continued as follows:

> [Defense counsel] criticizes witnesses that were not called and that's, I'm going to say that's misleading and a little bit disingenuous on his part in that either side, there's only one person that is not available to either side to call as a witness and that is the [D]efendant. The [S]tate cannot call the [D]efendant, we talked about that in jury selection, you can't take any negative inference from that, etc., etc. Other than that, these people are free to be called by the defense just as much as the [S]tate is.
>
> Officer [F]ernandez, first of all, if she had bent down to get the box, you know, she knows, if you look at the video again and if you remember, Officer Fox, it says he's going to kind of watch the [D]efendant, so he's kind of standing up there, and she reaches down and out of the floor in the floorboard and gets this box. She's going to get the box, Officer Fox has got [the Defendant] covered more or less, and she pulls the box out. Now certainly if she had seen the gun, she would have screamed her head off, gun. So I'll concede that she didn't see anything that looked like a gun. Okay? So I don't know why he feels like Officer [F]ernandez is the key to this case, but if he felt like Officer [F]ernandez was the key to the case, he could have subpoenaed Officer [F]ernandez---

At this juncture, defense counsel requested to approach the bench, and a conversation took place off the record. The State resumed its argument as follows:

> As I said, the defense is equally capable, when I talked about this in jury selection, of calling witnesses that they wish to call. They could have called Officer [F]ernandez . . . . They could have put these two women on.
>
> Now let's talk about the two women for a minute. If I had called them as witnesses, first of all I'm not going to call somebody unless I feel confident

that they are going to be truthful to you all. But if I had called them, I don't know how you could necessarily believe what they say, because they're operating in their own self interest, they're to some degree involved in drugs. I mean if they came in here and said I don't know, I didn't have anything to do with these drugs, and I don't know how [the Defendant] had them or whatever, know if that's going to be anything that's worth anything for you to take back there, one way or the other. But as I said, if [defense counsel] had wished to call them and felt like he could have added something to ya'all's [sic] information that would benefited him, he would have done that, could have done that.

After the jury retired to deliberate, defense counsel asked to place the objection he made during the State's rebuttal on the record. Counsel stated that he had objected to the State's "effectively commenting on the [D]efendant's failure to call witnesses or present evidence." Counsel noted that because the trial court took no corrective action, he interpreted the objections to have been overruled. The court stated that it

did not make a ruling at that time as [it] did not see that that was offensive to the point that the court would have to instruct the jury as to disregard certain things. There was not a mention of the [D]efendant's failure to testify. It was the opportunity that the [D]efendant to present witnesses or evidence being the same as what the [S]tate had.

The trial court's jury instructions included that the arguments of counsel were not to be considered as evidence and that the State's burden was to prove the elements of each offense beyond a reasonable doubt. During deliberations, the jury submitted two written questions to the trial court asking if the Defendant had the ability to have the pistol fingerprint tested and whether the Defendant would be obligated to disclose the results of such testing to the State. After consulting the parties, the court sent back a written statement repeating that the jury could only consider the evidence presented at trial and the court's instructions. After the verdict was returned, defense counsel reiterated his missing witness objection and moved for a mistrial, arguing that the jury's questions reflected that the improper rebuttal argument had improperly influenced it. The court denied the motion.

We agree with the State that the prosecutor's discussion of Officer Fernandez, Ms. Hardie, and Ms. Swanson was permissible because he did not implicate the missing witness rule. The prosecutor did not seek to establish that any of the three witnesses would have favored the Defendant by nature of their relationship or ask the jury to infer anything from their absence. Instead, the prosecutor responded to the Defendant's closing argument attacking the thoroughness of the State's investigation and urging the jury to find reasonable doubt in the absence of the witnesses' testimony by noting that the witnesses

- 17 -

were equally available to both parties.  See State v. Cody Cofer, No. E2011-00727-CCA-R3-CD, 2012 WL 3555310, at *20 (Tenn. Crim. App. Aug. 20, 2012) (stating in the context of a missing witness jury instruction that in order to invoke the missing witness inference "the witness must not have been equally available to both parties") (citing State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992); State v. Eldridge, 749 S.W.2d 756, 758 (Tenn. Crim. App. 1988)).  The Defendant is not entitled to relief on this basis.

Relative to the allegation of improper burden shifting, we reiterate that the State merely noted that the witnesses in question were equally available to both parties.  See Cofer, 2012 WL 3555310, at *20-22 (concluding that the State did not improperly shift the burden of proof during rebuttal argument when the defendant "made an issue of the fact" that a witnesses did not testify and the prosecutor responded that the defendant could also have called the witness).  The trial court did not err by finding that the State's argument was proper in this respect.

Insomuch as the Defendant raises a separate issue relative to the prosecutor's articulating personal opinions during rebuttal argument, it was not included in Defendant's contemporaneous objection or raised in the twice-amended motion for new trial.[4] Consequently, it has been waived.  See Tenn. R. App. P. 3(e) (treating issues "upon which a new trial is sought" as waived "unless the same was specifically stated in a motion for a new trial"); see also State v. Harbison, 539 S.W.3d 149, 164 (Tenn. 2018) (citations omitted).  We will, however, examine it for plain error.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted).  "An error would have to [be] especially

---

[4] The motion for new trial hearing transcript was not included in the appellate record, and the trial court's written order denying the motion did not include detailed findings of fact and conclusions of law for each ground raised in the motion other than a suppression issue.  Nevertheless, it appears from the record that in the motion, the Defendant only contested the trial court's overruling his objection related to the missing witness rule during the State's rebuttal argument and the court's denying his post-trial motion regarding the same.

egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

We are constrained to agree with the Defendant that the prosecutor improperly articulated his personal opinions during rebuttal argument. The prosecutor's explanation that he did not call Ms. Swanson and Ms. Hardie as witnesses because he would not call a witness without confidence that the person would be truthful was an improper opinion about the credibility of the two women. See, e.g., State v. Frederick King, No. E2014-00448-CCA-R3-CD, 2015 WL 4366575, at *13-14 (Tenn. Crim. App. July 16, 2015) (concluding that although the prosecutor was responding to defense counsel's argument by "referring to her 'ethical duty here to only proffer evidence and testimony that is credible,'" the statement "was an attempt to vouch for [two witnesses'] credibility").

Nevertheless, we do not think that these improper comments tainted the verdict such that plain error relief is necessary to do substantial justice. The evidence at trial amply established the Defendant's guilt, and the jury was properly instructed about the State's burden of proof and that the attorneys' arguments were not evidence. The jury is presumed to have followed the trial court's instructions, including the supplementary instructions provided in response to the questions during deliberations. Banks, 271 S.W.3d at 134; see State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). The Defendant is not entitled to relief on this basis.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

---

D. KELLY THOMAS, JR., JUDGE